David R. Johanson (Bar No. 164141)
E-mail: drj@esop-law.com
Sara Adibisedeh (Bar No. 244778)
E-mail: sara@esop-law.com
JOHANSON BERENSON **E-FILING**
1792 Second Street
Napa, CA 94559
Telephone: (707) 226-8997
Facsimile: (707) 229-2493

Attorneys for Plaintiff
CRYOTECH INTERNATIONAL, INC.

**FILED**

2008 JUN 12  A 11: 08

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA, S.J.

**ADR**

Feelaid
S1

UNITED STATES DISTRICT COURT

NORTH DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CRYOTECH INTERNATIONAL, INC.,
a Delaware corporation, fka VBS
INDUSTRIES INCORPORATED

Plaintiff,

vs.

TECHNIFAB PRODUCTS, INC.,
an Indiana corporation; and DOES 1-50,
inclusive

Defendants.

**C 08   02921   HRL**

CASE NO.

COMPLAINT FOR DAMAGES AND
APPLICATION FOR PERMANENT
INJUNCTION

1. BREACH OF CONTRACT

2. INTERFERENCE WITH PROSPECTIVE
ECONOMIC ADVANTAGE

3. MISAPPROPRIATION OF TRADE
SECRETS

4. UNFAIR COMPETITION

Plaintiff, CRYOTECH INTERNATIONAL, INC., a Delaware corporation ("Plaintiff" or

"Cryotech"), sues Defendants TECHNIFAB PRODUCTS, INC. an Indiana corporation, and

DOES 1-50, inclusive (collectively, "TECHNIFAB PRODUCTS, INC." and "DOES 1-50,

inclusive" are referred to as "Defendant" herein), and complains and alleges as follows:

**ALLEGATIONS OF JURISDICTION, VENUE AND PARTIES**

1.      Jurisdiction is based on 28 U.S.C. Section 1332, in that this is a civil action

between citizens of different states of the United States (Plaintiff is a citizen of California for

1

**COMPLAINT**

1    purposes of diversity jurisdiction and Defendant TECHNIFAB PRODUCTS, INC. is a citizen of

2    Indiana for purposes of diversity jurisdiction), and in which the matter in controversy exceeds the

3    sum or value of Seventy-Five Thousand and No/100 Dollars ($75,000.00), exclusive of interest

4    and costs.

5        2.    Venue is proper in this district pursuant to 28 U.S.C. Section 1391(c) in that a

6    corporation shall be deemed to reside in any judicial district in which it is subject to personal

7    jurisdiction.  On information and belief, by doing continuous and systematic business in the

8    Northern District of California, Defendant TECHNIFAB PRODUCTS, INC. as a corporation is a

9    resident of the Northern District of California for venue purposes.  Defendant TECHNIFAB

10   PRODUCTS, INC. also has transacted business within and throughout California and contracted

11   to supply goods within and throughout California in connection with the matters giving rise to

12   this suit.  Venue also is proper in the Northern District of California pursuant to 28 U.S.C. Section

13   1391(a)(2) because a substantial part of the events giving rise to this action occurred in this

14   judicial district.  Plaintiff has its principal place of business in the Northern District of California,

15   and has been injured in the Northern District of California and elsewhere by Defendant's conduct.

16       3.    Cryotech is, and at all times herein mentioned was, a corporation duly organized

17   and existing under and by virtue of the laws of Delaware, with its principal place of business

18   located in Campbell, Santa Clara County, California.  Cryotech has been a nationwide leader in

19   vacuum jacketed cryogenic transfer systems and related equipment for almost thirty years.

20   Formerly known as VBS Industries Incorporated and VBS International, Inc., Cryotech has

21   engineered, designed, sold, distributed, installed, serviced, and maintained thousands of liquid

22   nitrogen (LN2) transfer systems.  As cryogenic specialists, Cryotech's customers turn to it for a

23   wide range of products including dynamic and static vacuum piping systems, liquid nitrogen

24   dosing systems, automatic filling systems, gas panels and manifolds, and cryogenic repairs.

25   Cryotech is headquartered in Silicon Valley (Campbell, Santa Clara County, California) with

26   regional offices strategically located in New York, North Carolina, Southern California and the

27   Philippines and with an extensive world-wide network of company certified distributors.  Plaintiff

28   is a "person" pursuant to California Business and Professions Code §§ 17204 and 17535.

2

**COMPLAINT**

1      4.    a.     Cryotech is informed and believes, and based thereon alleges, that

2  Defendant TECHNIFAB PRODUCTS, INC., is, and at all times relevant was, a corporation duly

3  organized and existing under and by virtue of the laws of Indiana, with its principal place of

4  business located in Indiana. According to its internet website

5  (http://www.technifab.com/products/), Defendant TECHNIFAB PRODUCTS, INC. manufactures

6  storage and transfer equipment for handling cryogenic liquids. It offers a standard line of vacuum

7  jacketed transfer piping systems and flexible transfer lines, which may be generally manufactured

8  to customer specifications, and provides accessories such as connectors, valves, phase separators

9  and more are also available. Furthermore, Defendant also manufactures cryogenic liquid storage

10  containers and devices (cryogenic dewars), which also may be designed and manufactured to

11  customer specifications. Defendant TECHNIFAB PRODUCTS, INC. is and at all times herein

12  mentioned, has been considered a "person" pursuant to Business & Professions Code §§ 17201

13  and 17506.

14      b.     Defendants, DOES 1-50, inclusive, are and at all times herein mentioned

15  have been, each considered "persons" pursuant to California Business & Professions Code §§

16  17201 and 17506. Defendant DOES 1-50, inclusive, are sued in this Complaint under fictitious

17  names because their true names and capacities are not known at this time. Upon ascertaining

18  their true names and capacities, Plaintiff shall amend this Complaint and state them herein.

19      c.     Cryotech alleges, on information and belief, that each of Defendants

20  herein, including fictitiously named Defendants, are responsible for the act(s), practice(s),

21  omission(s), and/or occurrence(s) alleged in this Complaint, and that the harm to the general

22  public, as alleged in this Complaint, was proximately caused thereby.

23      d.     Cryotech is informed, believes and thereon alleges, that at all times herein

24  mentioned Defendant TECHNIFAB PRODUCTS, INC. completely controlled, dominated,

25  managed, supervised and operated all other Defendants such that the other Defendants were mere

26  instrumentalities or conduits through which Defendant TECHNIFAB PRODUCTS, INC. pursued

27  the business enterprise of advertising, selling, financing, installing, causing to be installed, and

28  making promises regarding the manufacturing of storage and transfer equipment for handling

3

cryogenic liquids and cryogenic liquid storage containers and devices (cryogenic dewars) and Defendant TECHNIFAB PRODUCTS, INC. is the alter ego of each Defendant herein. By reason of the foregoing there exists, and at all times herein mentioned, existed such a unity of interest and ownership between and among Defendant TECHNIFAB PRODUCTS, INC. and each of Defendants herein such that any individuality and separateness between any such Defendant has ceased, and each Defendant is the alter ego of each other Defendant and of TECHNIFAB PRODUCTS, INC.

## NATURE OF THIS CASE

5.    This lawsuit seeks to protect Cryotech's goodwill, confidential business information, and customer relations against the further predation and treachery of Defendant. Defendant is a manufacturer that entered into an Exclusive Manufacturing and Distributor Agreement with Cryotech, dated September 10, 2001 (the "Agreement"), to produce certain products to be sold and distributed by Cryotech for resale and distribution on a global basis. The Agreement provided, among other things, (a) prohibitions on Defendant to sell enumerated items to other general distributors, and (b) a "Confidentiality Agreement" providing, among other things, that Defendant would restrict access to others and disclosure by Defendant of creative, technical, economic, and business information constituting Cryotech's trade secrets.

6.    Despite the long-standing relationship between Cryotech and Defendant, Cryotech has become aware that Defendant began using misappropriated trade secrets and other of Cryotech's confidential and proprietary information that Defendant contracted to maintain as confidential pursuant to the Agreement to solicit and to do business with certain Cryotech customers that had previously been buying products directly from Cryotech that Defendant manufactured for Cryotech pursuant to the Agreement. The conduct of Defendant in breach of the Agreement and otherwise prohibited by law has caused damages to Cryotech, which are ongoing, and which to date are difficult to establish; however, are believed to have exceeded Seven Hundred Fifty Thousand and No/100 Dollars ($750,000.00).

4

**COMPLAINT**

1

## FACTS COMMON TO ALL CLAIMS

2    7.    Cryotech is engaged in the highly competitive business of marketing, engineering,

3    designing, selling, distributing, installing, servicing, and maintaining liquid nitrogen (LN2)

4    transfer systems. The success of Cryotech's business has required, and continues to require, the

5    expenditure of substantial amounts of money, the use of skills developed over a long period of

6    time, and developing a relationship with customers of understanding their specific product and

7    service needs as well as developing and marketing its products and services; developing and

8    implementing its unique business methods, practices and procedures; developing and maintaining

9    confidential information regarding its business, finances, products, services and clients; and

10    developing customer goodwill. The cryogenic supply industry is highly competitive, where at

11    least six companies regularly compete with one another. Typically, these companies sell similar

12    products and services to the same general customer base and thus spend considerable time and

13    effort developing and maintaining their existing customer base and new business leads and

14    guarding the secrecy of its proprietary and confidential information and trade secrets, including,

15    without limitation, that relating to pricing techniques, product and equipment costs, customer lists

16    and requirements, and the development of new business. Cryotech is no different; similarly

17    peculiar to Cryotech is the process by which it markets its products and services. Customers in

18    the cryogenic supply industry tend to purchase products and services from a single supplier. As a

19    result, demand for Cryotech's products and services infrequently varies. Moreover, Cryotech

20    develops substantial new business through referrals, and is four to five times more likely to sell

21    products and services to prospective clients who are referred to it by existing customers than it

22    would otherwise, such as through "cold-call" canvassing techniques. Thus, Cryotech's

23    relationships between its customers and Cryotech as their supplier is well developed and

24    cultivated and confidential and proprietary information and trade secrets are highly valuable to

25    Cryotech and gives Cryotech an earned competitive advantage over others.

26    8.    In consideration of being an exclusive manufacturer for Cryotech, Defendant

27    entered into a "Confidentiality Agreement" as part of its general Agreement with Cryotech. A

28    true and correct copy of the Agreement is attached hereto as <u>Exhibit A</u> and made a part hereof by

5

**COMPLAINT**

1   this reference.

2       9.      The Confidentiality Agreement contained the following specific provisions, among

3   others:

4           "(a)    Each party may have developed or acquired creative, technical, economic,

5   and business information constituting trade secrets or intellectual property of that party (the

6   "Information").

7           (b)     TPI [Defendant] or VBS [Plaintiff] may, in each party's own discretion,

8   provide to the other party access to that portion of the Information that may be useful to the other

9   party for the purpose of complying with the provisions of this Agreement.

10          (c)     Each party shall maintain as confidential all Information of the other party

11  which is made available to the other party and which is marked as "Confidential", or if provided

12  in verbal form, is accompanied with a clear indication of confidentiality or followed within five

13  (5) days of the date of verbal disclosure with a writing indicating the disclosure's confidentiality

14  (the "Confidential Information").

15          (d)     Neither party shall use the other party's Confidential Information, except

16  for the purpose(s) stated herein, and shall not disclose Confidential Information to any third party,

17  unless the prior written approval of the provider of the Confidential Information is received.

18          (e)     Each party shall restrict access to the other party's Information to its agents

19  or employees who have been identified by the party receiving the Information as requiring access

20  to the Information to accomplish the purpose(s) stated herein. . . .

21          (i)     . . . . The terms of this Confidentiality Agreement may be enforced through

22  any remedy available at law or in equity, including injunctive relief."

23      10.     In order for Defendant to carry out its duties and responsibilities as Cryotech's

24  manufacturer pursuant to the Agreement, Cryotech entrusted to Defendant various highly

25  confidential information, trade secrets, and proprietary information (collectively referred to

26  hereinafter as the "Trade Secrets"), including, without limitation, the following:

27      (a)     Cryotech's product information, including, without limitation, detailed

28  specifications and drawings for the products that Defendant contracted to manufacture for

6

**COMPLAINT**

1   Cryotech;

2          (b)     Cryotech's customer lists;

3          (c)     Cryotech's contact names and information; and

4          (d)     Cryotech's special buying needs, buying patterns, and buying preferences of

5   customers.

6          11.     All of the Trade Secrets relating to Cryotech's business methods, including, but

7   not limited to, the highly confidential customer lists and records, were developed by Cryotech;

8   and Cryotech provided its Trade Secrets to Defendant and/or the Trade Secrets were acquired by

9   Defendant during the course of Defendant's manufacturing relationship with Cryotech, and they

10  were and is confidential information, trade secrets and proprietary information not generally

11  accessible to third parties outside of Cryotech.

12         12.     Cryotech went to great lengths to protect its Trade Secrets. The Trade Secrets and

13  other confidential and proprietary information have been developed at great expenditure of time,

14  money and effort by Cryotech, are maintained confidentially within Cryotech, and are the subject

15  of efforts that are reasonable under the circumstances to retain their secrecy. The Trade Secrets

16  and other confidential and proprietary information are not readily available to the general public

17  nor is it possible for such information to be properly acquired by others.  No employees other

18  than key Cryotech employees are allowed access to the Trade Secrets and Cryotech's other

19  confidential and proprietary information.  No competitor of Cryotech could gain access to the

20  Trade Secrets and other confidential and proprietary information absent a violation of the

21  confidentiality within which it is held.  As part of Cryotech's concerted effort to protect its Trade

22  Secrets and other confidential and proprietary information and goodwill, employees and others,

23  such as manufacturers and distributors for Cryotech, with access to the Trade Secrets and other

24  confidential and proprietary information of Cryotech are required to sign confidentiality

25  agreements regarding this information.  The Trade Secrets and other confidential and proprietary

26  information are an enormously valuable resource of Cryotech, and would be valuable to

27  competitors, such as Defendant, because such competitors could not legally duplicate the Trade

28  Secrets and Cryotech's other confidential and proprietary information without years of effort and

7

1    expense.

2    13.    Cryotech requires its employees to sign written non-disclosure, proprietary rights,

3    and confidentiality agreements, like the Confidentiality Agreement that Defendant signed as part

4    of the Agreement, wherein Cryotech's employees agree that the above-referenced Trade Secrets

5    and other confidential and proprietary information of Cryotech are confidential, a trade secret and

6    proprietary and that such information may only be used in connection with his or her employment

7    with Cryotech and may not be disclosed to or used by third parties, except as specifically

8    permitted and approved by Cryotech.  Furthermore, Cryotech's employee handbook informs its

9    employees of the proprietary rights of Cryotech to the Trade Secrets and Cryotech's other

10    confidential and proprietary information.

11    14.    Defendant informed Cryotech that Defendant maintained Cryotech's client list in a

12    separate database with restricted entry, and was otherwise maintaining the confidentiality of

13    Cryotech's Trade Secrets and other confidential and proprietary information, and was not

14    violating the Agreement.

15    15.    On or around September 27, 2005, however, one of Cryotech's largest customers

16    informed Cryotech's President, Gary L. Sandercock, that Defendant had approached such

17    customer to manufacture and sell directly to them because, according to Defendant, Defendant

18    manufactured Cryotech's products and had a joint venture with Cryotech.

19    16.    Immediately thereafter, Cryotech's President, Gary L. Sandercock, contacted

20    Defendant's President, Stephen Short, regarding the events of September 27, 2005.  Defendant's

21    President informed and assured Mr. Sandercock and Cryotech that such practices would stop.

22    17.    Approximately one year later, on or around September 26, 2006, Cryotech's

23    President called Defendant's Vice President of Sales and Marketing, Douglas Short.  Cryotech's

24    President informed Douglas Short and Defendant that Defendant's salespeople had been

25    informing Cryotech's customers that Defendant produced Cryotech's products so customers may

26    as well purchase directly from Defendant.  Furthermore, Cryotech's President informed Douglas

27    Short and Defendant that this was a violation of the Agreement.  Douglas Short stated that if he

28    discovered that any of Defendant's salespeople were engaging in such activity, they would be

8

**COMPLAINT**

1  fired, and that he would investigate such activity. Afterwards, Douglas Short left a voicemail
2  message for Mr. Sandercock to the effect that one of Defendant's salesmen had indeed contacted
3  Cryotech's customers directly on May 10, 2006, and indicated that such customer information
4  was considered confidential, and that he had talked to his [Defendant's] salespeople about
5  Cryotech's legitimate concerns and counseled Defendant's salespeople not to engage in this
6  unlawful conduct that was contrary to the Agreement.

7      18.    On or around March 8, 2007, Cryotech's President, called Douglas Short and
8  ended up talking to Defendant's President, Stephen Short, instead about Cryotech's decreased
9  sales. One of Cryotech's customers who had been a customer for a decade had switched to
10  purchasing products directly from Defendant. Defendant's President informed Cryotech's
11  President that Defendant was focused on growing its own business. Furthermore, Defendant's
12  President also stated that he thought the Agreement was over. Cryotech's President responded
13  that the term of the Agreement did not expire until September of 2008 and that the Agreement
14  continued to be in full force and effect.

15      19.    On or around August 28, 2007, Cryotech's President discovered that Defendant
16  had hired at least one new local salesperson in Northern California to take sales from
17  Cryotech's customers and move them directly to Defendant by using Cryotech's shipping
18  information and soliciting those Cryotech customers directly.

19      20.    On or around September 7, 2007, Defendant's President delivered via Certified
20  U.S. Mail to Cryotech's President a "Twelve Month Notice of Termination" pursuant to the
21  Agreement (the "Notice"). The Notice stated that the Agreement would terminate on September
22  10, 2008.

23      21.    On or around the week of September 28, 2007, Cryotech discovered that a
24  Cryotech customer for whom it had installed an extensive system of approximately Two Hundred
25  Fifty Thousand and No/100 Dollars ($250,000.00) worth of materials was being supplied with
26  replacement StatiFlex pipe manufactured by Defendant. This conduct is in direct violation of the
27  Agreement.

28

9

**COMPLAINT**

22.    Cryotech is informed and believes, and based thereon alleges, that in anticipation of the pending termination of the Agreement, Defendant has misappropriated and improperly utilized Cryotech's Trade Secrets and other confidential and proprietary information to solicit Cryotech's customers and cause them to switch to conducting business directly with Defendant in violation of the Agreement.

23.    Cryotech has had numerous communications with Defendant and demanded that Defendant stop unlawfully using Cryotech's Trade Secrets and other confidential and proprietary information to solicit, communicate with, and do business with Cryotech's customers directly, and to otherwise refrain from violating the Agreement.  Defendant, however, has willfully and furtively continued to actively use Cryotech's Trade Secrets and other confidential and proprietary information to solicit, communicate with, and do business with customers who previously did business with Cryotech.  Defendant has used Cryotech's Trade Secrets and other confidential and proprietary information to obtain such Cryotech customers' business and to unlawfully compete against Cryotech, which is an impermissible purpose under the Agreement.

24.    Cryotech is informed and believes, and based thereon alleges, that Defendant has divulged and otherwise revealed to Cryotech's customers and Defendant's salespeople the names, contact information, and other confidential or Trade Secret information of Cryotech, and improperly used and utilized that information, to solicit Cryotech's customers to switch to conducting business directly with Defendant in violation of the Agreement.

## FIRST CLAIM

### (Breach of Contract)

25.    Cryotech incorporates by reference, as though fully set forth herein, paragraphs 1 through 24 of this Complaint.

26.    Cryotech is informed and believes, and based thereon alleges, that Defendant breached the Agreement by: (a) directly or indirectly using, disclosing, or disseminating to another person, organization, or entity the Trade Secrets, and Cryotech's other proprietary, and/or confidential information in violation of the Agreement; (b) directly or indirectly soliciting, contacting, calling upon, diverting, communicating with, doing business with, or attempting to

10

communicate or do business with, Cryotech's customers whom Defendant contacted, solicited, or serviced while under the Agreement with Cryotech and about whom Defendant had Trade Secrets, and other proprietary and/or confidential information of Cryotech; (c) communicating to its own salespeople, the names and contact information of Cryotech's customers, purchasing authority(ies), buying habits, preferences and needs, as well as other confidential trade secret and proprietary information relating to such Cryotech customers; (d) misappropriating the Trade Secrets and other confidential and proprietary records and information belonging to, constructed, maintained or developed by Cryotech; (e) using Cryotech's Trade Secrets, and Cryotech's other proprietary and confidential information for the purposes of soliciting Cryotech's customers and/or competing against Cryotech; and (f) disclosing Cryotech's Trade Secrets to Cryotech's customers or former customers and/or otherwise utilizing Cryotech's Trade Secrets and Cryotech's other proprietary and confidential information for the purpose of competing against Cryotech unlawfully and in direct contravention of the Agreement.

27.    As a result of Defendant's breach(es) of the Agreement, Cryotech has been damaged, the full nature and extent of which are presently unknown to Cryotech, and Cryotech will demonstrate those damages at the time of trial. Cryotech also is entitled to reasonable attorneys' fees and costs.

28.    Cryotech is informed and believes, and based thereon alleges, that Defendant threatens to and, unless restrained by this Court, will continue to do the acts complained of herein, all to Cryotech's continuing irreparable damage in that Cryotech believes it will lose existing accounts, as well as potential business and customers, and not be able to regain its business relationships with Cryotech's former customers that Defendant unlawfully obtained by violating the Agreement. It will be extremely difficult to ascertain the amount of compensation that will afford Cryotech adequate relief for these injuries.

29.    Cryotech has no adequate remedy at law to compel Defendant to cease its unlawful actions and to stop conducting business with Cryotech's former customers in violation of the Agreement. Unless this Court grants an injunction, Cryotech will be compelled to prosecute a multiplicity of actions, one for each time Defendant violates the Agreement. In each such action,

11

**COMPLAINT**

1   it will be extremely difficult to ascertain the amount of compensation which will afford Cryotech

2   adequate relief therefor.

3                                   **SECOND CLAIM**

4   **(Interference With Prospective Economic Advantage Against Defendant)**

5         30.    Cryotech incorporates by reference as though fully set forth herein, paragraphs 1

6   through 29 of this Complaint.

7         31.    Cryotech is informed and believes, and on that basis alleges, that in or about 2005,

8   and continuously thereafter, Defendant solicited and/or contacted various Cryotech customers

9   whose identities and contact information Defendant obtained through Defendant's breach(es) of

10  the Agreement and wrongful exploitation of Cryotech's Trade Secrets and other confidential and

11  proprietary information.  The purpose of such contacts and solicitation was and continues to be to

12  transfer the business of Cryotech's customers to Defendant, which did, would, and continues to

13  result in increased sales to Defendant at Cryotech's expense and damage.

14        32.    Cryotech is informed and believes, and on that basis alleges, that by the above-

15  stated wrongful acts, Defendant has interfered with Cryotech's prospective economic advantage

16  from developing and servicing Cryotech's former, present, and prospective customers.  Cryotech

17  is informed and believes, and on that basis alleges, that it has and will continue to incur lost

18  opportunity from the lost referrals and collateral business connections which might have been

19  available if Defendant's interference had not deprived Cryotech of the sales to those former,

20  present, and prospective customers.  Furthermore, Defendant has wrongfully appropriated

21  information regarding potential business, which information has been developed by Cryotech and

22  its employees at great time, effort, and expense and resulted from established relationships that

23  Cryotech has and previously had with its customers.  Defendant seeks to exploit the potential

24  business information developed by Cryotech for its own benefit.

25        33.    Cryotech is informed and believes, and on that basis alleges, that the wrongful

26  actions by Defendant were accomplished with the intent to injure Cryotech and its business.

27  Cryotech is further informed and believes, and on that basis alleges, that Defendant engaged in

28  such despicable acts maliciously, oppressively, and with a wanton disregard of Cryotech's rights.

                                        12

1    Cryotech is, therefore, entitled to exemplary and punitive damages against Defendant, in an

2    amount according to proof at trial.  Cryotech also is entitled to reasonable attorneys' fees and

3    costs.

4        34.    Cryotech is informed and believes, and on that basis alleges, that Defendant

5    threatens to and, unless restrained by this Court, will continue to do the acts complained of herein,

6    all to Cryotech's irreparable damage in that Cryotech believes it will continue to lose accounts of

7    its current customers, as well as potential business and customers, and will not be able to regain

8    its business relationships with Cryotech's former customers that Defendant unlawfully obtained

9    by violating the Agreement.  It will be extremely difficult to ascertain the amount of

10   compensation that will afford Cryotech adequate relief for these injuries.

11       35.    Cryotech has no adequate remedy at law to compel Defendant to cease its

12   wrongful interference.  Unless this Court grants a permanent injunction, Cryotech will be

13   compelled to prosecute a multiplicity of actions, one for each time Defendant interferes with the

14   prospective economic advantage to be gained by Cryotech from Defendant's use of Cryotech's

15   Trade Secrets, and Cryotech's other proprietary and confidential information.  Furthermore, once

16   Defendant has interfered with Cryotech's prospective economic advantage, it will be impossible

17   for Cryotech to undo the harm created by that conduct.  No action by Cryotech can restore the

18   status quo, nor can monetary damages alone completely compensate Cryotech for the value of

19   lost information.

20                              **THIRD CLAIM**

21                   (Misappropriation of Trade Secrets Against Defendant)

22       36.    Cryotech incorporates by reference as though fully set forth herein, paragraphs 1

23   through 35 of this Complaint.

24       37.    Cryotech was in possession of the aforementioned Trade Secrets and Cryotech's

25   other proprietary and confidential information.

26       38.    Cryotech's Trade Secrets and other proprietary and confidential information have

27   and had economic value in that the use of those Trade Secrets and other proprietary and

28   confidential information enabled Cryotech to identify and fulfill the needs of its customers better

                                        13

1   than its competitors. Cryotech's Trade Secrets and other proprietary and confidential information

2   also enabled Cryotech to identify and market to specific customers whom were and are likely to

3   purchase Cryotech's products and the individuals who had specific purchasing authority.

4   Cryotech made reasonable efforts to insure that Cryotech's Trade Secrets and Cryotech's other

5   proprietary and confidential information remained secret by disclosing the information only to

6   persons who had to know such information in order for Cryotech to conduct its business and

7   entered into confidentiality agreements with those persons.

8       39.    Cryotech is informed and believes, and on that basis alleges, that in or about 2005,

9   and continuing thereafter to the present, Defendant misappropriated the above-described Trade

10  Secrets, and other proprietary and confidential information of Cryotech. Defendant acquired,

11  utilized and divulged Cryotech's Trade Secrets and Cryotech's other proprietary and confidential

12  information by improper means, including breach(es) of its contractual and common law duties to

13  Cryotech to maintain the secrecy of Cryotech's Trade Secrets and Cryotech's other proprietary

14  and confidential information and Defendant knew or had reason to know that Cryotech's Trade

15  Secrets and Cryotech's other proprietary and confidential information were acquired, retained,

16  used, utilized and divulged by an improper means.

17      40.    Defendant, by engaging in the above described conduct, has misappropriated and

18  misused Cryotech's valuable and confidential information, Cryotech's Trade Secrets, and

19  Cryotech's other proprietary and confidential information to unlawfully and unfairly compete

20  against Cryotech. Defendant has divulged, disclosed or used Cryotech's Trade Secrets and

21  Cryotech's other proprietary and confidential information without the express or implied consent

22  of Cryotech at a time when it knew or had reason to know that its knowledge of Cryotech's Trade

23  Secrets and Cryotech's other proprietary and confidential information was: (a) derived from or

24  through a person or persons who had utilized improper means to acquire Cryotech's Trade

25  Secrets and Cryotech's other proprietary and confidential information; (b) acquired under

26  circumstances giving rise to a duty to maintain the secrecy of Cryotech's Trade Secrets and

27  Cryotech's other proprietary and confidential information or limit the use of Cryotech's Trade

28  Secrets and Cryotech's other proprietary and confidential information; and (c) derived from or

14

**COMPLAINT**

through a person or persons(s) who owed a duty to Cryotech to maintain the secrecy of the Trade Secrets and Cryotech's other proprietary and confidential information or limit its use. Defendant has knowingly accepted and profited from the misappropriation of Cryotech's proprietary and confidential information and Cryotech's Trade Secrets.

41. As a proximate result of the above-referenced misappropriation of Cryotech's Trade Secrets, proprietary and confidential information, Cryotech has suffered damages in an amount according to proof at trial.

42. Cryotech is informed and believes, and on that basis alleges, that Defendant accomplished the above-described wrongful actions against Cryotech with the intent to injure Cryotech and its business. Cryotech is further informed and believes, and on that basis alleges, that Defendant's despicable acts were accomplished maliciously, oppressively, and with a wanton disregard of Cryotech's rights. Cryotech is, therefore, entitled to exemplary and punitive damages against Defendant, in an amount according to proof at trial. Cryotech also is entitled to reasonable attorneys' fees and costs.

43. Cryotech is informed and believes, and on that basis alleges, that Defendant threatens to and, unless restrained by this Court, will continue to do the acts complained of herein, all to Cryotech's irreparable damage in that Cryotech believes it will continue to lose accounts, as well as potential business customers, and will not be able to regain its business relationships with Cryotech's former customers that Defendant unlawfully obtained by violating the Agreement. It will be extremely difficult to ascertain the amount of compensation that will afford Cryotech adequate relief for these injuries.

44. Cryotech has no adequate remedy at law to compel Defendant to cease its wrongful misappropriation, use and disclosure of Cryotech's Trade Secrets, and other proprietary and confidential information. Unless this Court grants a permanent injunction, Cryotech will be compelled to prosecute a multiplicity of actions, one for each time that Defendant uses and/or divulges the misappropriated Trade Secrets, and Cryotech's other proprietary and confidential information. Furthermore, once Defendant has used Cryotech's Trade Secrets and other proprietary and confidential information, it will be impossible for Cryotech to undo the harm

15

1    created by that conduct. No action by Cryotech can restore the status quo, nor can monetary

2    damages alone completely compensate Cryotech for the value of lost information.

3                                    **FOURTH CLAIM**

4                          **(Unfair Competition Against Defendant)**

5        45.    Cryotech incorporates by reference as though fully set forth herein, paragraphs 1

6    through 44 of this Complaint.

7        46.    Defendant's breach of contract, interference with prospective economic advantage,

8    and misappropriation of Cryotech's Trade Secrets and Cryotech's other proprietary and

9    confidential information, as alleged above, constitute unfair competition in violation of Section

10   17200 of the California Business and Professions Code and the common law of California.

11       47.    Cryotech is informed and believes, and on that basis alleges, that Defendant

12   accomplished the above-described wrongful actions against Cryotech with the intent to injure

13   Cryotech and its business. Cryotech is further informed and believes, and on that basis alleges,

14   that Defendant accomplished its despicable acts maliciously, oppressively, and with a wanton

15   disregard of Cryotech's rights. Cryotech is, therefore, entitled to exemplary and punitive

16   damages against Defendant, in an amount according to proof at trial. Cryotech also is entitled to

17   reasonable attorneys' fees and costs.

18       48.    Cryotech is informed and believes, and on that basis alleges, that Defendant

19   threatens to and, unless restrained by this Court, will continue to do the acts complained of herein,

20   all to Cryotech's irreparable damage in that Cryotech believes that it will lose accounts, as well as

21   potential business customers, and will not be able to regain its business relationships with

22   Cryotech's former customers that Defendant unlawfully obtained by violating the Agreement. It

23   will be extremely difficult to ascertain the amount of compensation that will afford Cryotech

24   adequate relief for these injuries.

25       49.    Cryotech has no adequate remedy at law alone to compel Defendant to cease its

26   wrongful conduct. Unless this Court grants a permanent injunction, Cryotech will be compelled

27   to prosecute a multiplicity of actions. No action by Cryotech can restore the status quo, nor can

28   monetary damages alone completely compensate Cryotech for the value of lost information

1    and/or unfair competition.

2                              **PRAYER FOR RELIEF**

3        WHEREFORE, Cryotech prays for judgment as follows:

4        1.    For a permanent injunction compelling Defendant and all persons acting in concert

5    and participation with them during the pendency of this action, and permanently thereafter, to

6    return to Cryotech the originals, copies (carbon, photographic, electronic, or by any other means

7    whatsoever), summary or information derived from, any records, notes, documents, memoranda,

8    computer printouts, computer programs, or any other medium containing of detailing Cryotech's

9    Trade Secrets, including, without limitation, the following: (a) Cryotech's customer lists; (b)

10   Cryotech's product information, including, but not limited to, drawings and specifications; (c) the

11   customer contact names and any information pertaining to the accounts that Defendant serviced

12   while under the Agreement with Cryotech (up to the present and through the end of the term of

13   the Agreement); (d) the identity and contact information of the person(s) with purchasing

14   authority and/or person(s) with influence over purchasing decisions for the accounts that

15   Defendant serviced while under the Agreement with Cryotech (up to the present and through the

16   end of the term of the Agreement); and (e) the customer profiles, buying needs, patterns, habits

17   and/or preferences of Cryotech's customers;

18       2.    For a permanent injunction restraining and enjoining Defendant and all persons

19   acting in concert and participation with them for a period to be proven at trial, from directly or

20   indirectly soliciting or in any other manner contacting, communicating, dealing, or doing business

21   with any of Cryotech's former or present customers or their representatives whom Defendant had

22   provided products for while under the restrictions of the Agreement with Cryotech, for the

23   purpose of selling, attempting to sell, or accepting orders, of any product or services similar to or

24   competitive with any product or services provided by Cryotech;

25       3.    For general damages in an amount to be proven at trial;

26       4.    For exemplary and punitive damages in an amount to be determined at trial;

27       5.    For reasonable attorneys' fees as provided by the provision of the Uniform Trade

28   Secret Act, Section 17200 *et seq.* of the California Business and Professions Code, and as

                                          17

                                     **COMPLAINT**

1  otherwise permissible;

2    6.    For costs of suit incurred herein; and

3    7.    For such other and further relief as the Court deems just and proper.

4                    Respectfully submitted,

5

6  DATED:  June 12, 2008

7                    JOHANSON BERENSON LLP

8

9                    By: _____

                        David R. Johanson
10                      Sara Adibisedeh
                        Attorneys for Plaintiff CRYOTECH
11                      INTERNATIONAL, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                         18

                      **COMPLAINT**

# EXCLUSIVE MANUFACTURING AND DISTRIBUTOR AGREEMENT

THIS EXCLUSIVE MANUFACTURING AND DISTRIBUTOR AGREEMENT ("Agreement"), made and entered into as of the 10th day of September, 2001 (the "Effective Date"), by and between TECHNIFAB PRODUCTS, INC., an Indiana corporation, having its principal place of business at 10339 N. Industrial Park Drive, P.O. Box 315, Brazil, Indiana, 47834 ("TPI"), and VBS INDUSTRIES INCORPORATED, a Delaware corporation having its principal place of business at 808 East McGlincey Lane, Campbell, California 95008 ("VBS").

## WITNESSETH:

WHEREAS, TPI and VBS wish to create a strong, cooperative relationship in which to grow their businesses together;

WHEREAS, TPI and VBS have expressed a desire to continue and strengthen the relationship presently existing between the two companies;

WHEREAS, TPI and VBS share a common vision and desire to significantly grow their respective companies;

NOW, THEREFORE, in consideration of the covenants herein contained and good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, TPI and VBS agree as follows:

## 1.    Exclusive Manufacturer and Distributor

TPI hereby agrees to act as the exclusive manufacturer of certain products to be sold and distributed by VBS which products are listed in Schedule 1-A and 1-B attached hereto (the "Products"); TPI shall manufacture the Products for sale to VBS for resale and distribution on a global basis. It is agreed that TPI shall be the sole source of supply for the Products listed in Schedule 1-A and 1-B to VBS and VBS agrees that it will not arrange for the manufacture of those Products covered by this Agreement by itself or any of its Affiliates or by any other person or entity so long as TPI is able to produce sufficient quality and quantities of the Products to VBS on a reasonable basis. Except as hereinafter set forth, VBS shall act as the exclusive distributor of certain Products listed in Schedule 1-A and 1-B during the term of this Agreement; provided however, those Products listed on Schedule 1-B may be produced, manufactured and sold by TPI to other customers, so long as that customer is not a general distributor but is purchasing the Products for its own use or such customer is a manufacturer or a producer incorporating the Product for its own use or such customer is a manufacturer or producer incorporating the Product to another end-user but is not acting as a general distributor. In addition, should VBS fail to produce sufficient orders on an annual basis for Products listed in Schedule 1-B for TPI to reasonably utilize its capacity for manufacturing of Products listed in Schedule 1-B, TPI shall be permitted to

manufacture said Products listed on Schedule 1-B for resale and distribution by itself or others, provided however TPI shall be required to give VBS six months prior written notice of the insufficient orders and a reasonable opportunity within said time for VBS to cure the deficiency. TPI agrees not to sell the Items listed in Schedule 1-A in their currently configured form or items that are substantially similar to these products to others, in competition with the business of VBS provided that VBS is not obtaining a substantially similar product from a source other than TPI. TPI reserves the right to continue unrestricted selling of products substantially similar to Statiflex without VBS style bayonets provided those sales are not to VBS customers.

2.    **Sales to and Duties of VBS**

(a)    VBS shall use its best efforts to promote the sale of the Products and to solicit orders for the Products from customers on a global basis.

(b)    VBS shall advise TPI of comments which may come to the attention of VBS concerning the nature performance or quality of the Products.

(c)    VBS shall promptly advise TPI whenever VBS reasonably expects an unusual supply requirement that TPI must satisfy pursuant to the terms of this Agreement.

3.    **New Products, Improvements to Existing Products and Joint Patents**

(a)    With respect to any Products not yet patented and with respect to any new Products developed jointly by the Parties or improvement to existing Products, if either Party desires to patent such new Products or improvement, it must first offer to the other Party the right to share in the ownership of the joint patent in which event if such right is exercised , the Parties shall likewise share the development cost, implementation cost and the cost of obtaining said patent.

(b)    TPI agrees that it shall notify VBS promptly of any material modifications, revisions (to the extent such modification or revision changes the functionality of or adversely affects the quality of the Product) or discontinuances of a Product supplied by TPI to VBS. In the event such modification, revision or discontinuances substantially adversely affects the marketability of any Product, VBS shall so notify TPI, and provide substantiating information to TPI and TPI shall have the right to comply with any reasonable request of VBS for further revisions or modifications or to release said Product from the terms of this Agreement.

(c)    Should VBS offer a new Product to TPI for inclusion in this Agreement, TPI shall have the opportunity to reject said new Product as being part of this Agreement, in which event said new Product may be developed, manufactured and sold by VBS independently of this Agreement and TPI shall have no rights with respect to said new products rejected by it; provided, however, if TPI has already been manufacturing said new Products (or products substantially similar thereto) or has already developed said new Products for sale independently of VBS, TPI shall retain all of its rights pertaining to said new Products.

4.    **Purchase Price and Payment**

(a)    The purchase prices that VBS shall pay TPI for the Products shall be pursuant to TPI's current price list. The purchase prices may be adjusted from time to time by mutual written consent of TPI and VBS. For items not on the price list, TPI shall provide a quotation as requested by VBS from time to time and VBS and TPI shall mutually agree in writing upon purchase prices for such items. All purchase prices for the Products shall be Free on Board Brazil, Indiana.

(b)    Notwithstanding the above, TPI shall have the right to increase the prices of the Products on account of increases in its raw material costs, labor costs and manufacturing procedure cost necessary to produce the products and for other increases in costs incurred beyond the reasonable control of TPI. TPI agrees to give sixty (60) days prior written notice to VBS before any such price increases take effect and to furnish substantiating information for such price increase.

(c)    For the Products that TPI sells to VBS, VBS will pay TPI's invoices in full in United States dollars within 45 days of the invoice date.

5.    **Technical Information and Data Storage**

(a)    TPI will provide VBS from time to time with such literature, engineering data and other sales materials TPI may prepare to assist VBS in performing services hereunder, and may furnish samples of the Products listed on Schedule 1-A. Upon the termination of this Agreement, VBS shall return all such material then in its possession.

(b)    To protect against a catastrophic event, TPI shall store technical data, drawings and material related to the Products in a secure and suitable off-site storage site by the end of 2001.

6.    **Independent Contractor**

VBS shall make no agreement or other statement or hold itself out as authorized to make any statement or agreement, or do anything which will have a binding effect upon TPI. This Agreement constitutes VBS as an independent contractor with TPI and not an agent, employee or partner of TPI nor as a joint ventures with TPI.

7.    **Confidentiality Agreement**

(a)    Each party may have developed or acquired creative, technical, economic, and business information constituting trade secrets or intellectual property of that party (the "Information").

(b)    TPI or VBS may, in each party's own discretion, provide to the

3

other party access to that portion of the Information that may be useful to the other party for the purpose of complying with the provision of this Agreement.

(c) Each party shall maintain as confidential all Information of the other party which is made available to the other party and which is marked as "Confidential", or if provided in verbal form, is accompanied with a clear indication of confidentiality or followed within five (5) days of the date of verbal disclosure with a writing indicating the disclosure's confidentiality (the "Confidential Information").

(c)     Neither party shall use the other party's Confidential Information, except for the purpose(s) stated herein, and shall not disclose Confidential Information to any third party, unless the prior written approval of the provider of the Confidential Information is received.

(d)     Each party shall restrict access to the other party's Information to its agents or employees who have been identified by the party receiving the Information as requiring access to the Information to accomplish the purpose(s) stated herein.

(e)     Should either party at any time be requested to do so, that party shall return to the other party the received Information and all other written information, models, drawings, photos, data, samples, and the like which the recipient may have received relating to the Information and all copies of the same or any portion thereof.

(f)     Nothing contained herein shall in any way restrict or impair either party's right to use or disclose the other party's Information which: (a) is known to the public other than by breach of this Agreement; (b) is in the party's possession prior to the time of the disclosure to the other party and was not acquired, directly or indirectly, from the other party; or (c) is made available by a third party who has the legal right to do so.

(g)     The terms of this Agreement shall not be construed to give either party a license under any patent, trademark, copyright or Confidential Information belonging to the other party.

(h)     For a particular Information, each party's obligation hereunder shall cease three (3) years from the date of disclosure of that particular Information.

(i)     A waiver of a breach of this Confidentiality Agreement shall not constitute a waiver as to any further breach. The terms of this Confidentiality Agreement may be enforced through any remedy available at law or in equity, including injunctive relief.

## 8.    Expense

VBS shall bear all expenses, including, but not limited to taxes, customs, duties, tariffs and other governmental levies and charges incurred by it, levied or assessed against it on account of sales of the Products.

9.    **Technical Assistance and Quality Control**

VBS shall have a right to perform periodic quality control audits and inspections and test the Products at TPI's facilities upon reasonable prior notice, at VBS's sole cost and expense.

10.    **Warranty**

(a)    The Products that are covered by this Agreement are warranted on a limited basis by TPI as more particularly set forth in the Limited Warranty attached hereto as Schedule 10. TPI will permit VBS to assign this limited warranty to its customers, on the condition that the warranty as described in Schedule 10 is delivered in writing to each such customer no later than the date of delivery of Products. VBS agrees that it shall make no other warranties regarding Products, and shall not in any way modify or alter this limited warranty. This Section 10 of this Agreement sets forth the exclusive and sole remedies of VBS and its customers with respect to defective Products.

(b)    The warranties set forth above in Section 10(a) of this Agreement are the only warranties made by TPI and TPI disclaims all other warranties either expressed or implied, including no warranties of merchantability or fitness for a particular purpose or arising from course or performance, course of dealing or usage of trade and any liability with respect to same whether in contract, tort or otherwise. In no event shall TPI be liable for any special, incidental, indirect or consequential damages or for the loss of profits, even if TPI shall have been advised in advance of the possibility of such potential loss or damage.

11.    **Term and Termination**

(a)    Term of this Agreement shall be seven (7) years. At the end of each year, TPI and VBS have the option to renew for one additional year by written agreement.

(b)    This agreement may be terminated by either party in the event of a material breach by the other party, or at the expiration to the term of this Agreement. The party wishing to terminate at expiration shall give the other party at least twelve (12) months prior written notice of its intention not to renew this Agreement at the end of its term.

12.    **Assignment**

This agreement may not be assigned or transferred by either party to a third party without the consent of the other party, which consent shall not be unreasonably withheld.

13.    **Trademarks**

5

VBS has the unfettered right to use the trademarks VBSFlex, Dynaflex, and Statiflex for marketing and sales of the Products.

### 14. Compliance with Laws

VBS shall be responsible for compliance with all applicable federal, state and local laws, ordinances, rules and regulations applicable concerning the sale by VBS of the Products.

### 15. Notices

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally or mailed by registered or certified mail, return receipt requested, to the addresses stated below or at such other address as may be designated in writing by notice given by registered or certified mail, return receipt requested.

To VBS:     VBS Industries Incorporated
            808 East McGlincey Lane
            Campbell, California 95008-5019
            Fax No: (408) 371-3320

To TPI:     Technifab Products, Inc.
            10339 N. Industrial Park Drive
            P.O. Box 315
            Brazil, Indiana 47834
            Fax: (812) 442-0891
            Attn: Steve Short

### 16. Miscellaneous

a.  VBS agrees that it shall not take any action that would cause TPI to be obligated to register with any governmental entity or agency or to qualify to do business in any geographic area.

b.  TPI reserves the right to continue selling the Products listed on Schedule 1-B without restriction to any Air Products and Chemicals, Inc. facility and to Southland Cryogenics, Inc.

c.  TPI reserves the rights to continue selling products to Air Products and Chemicals that are substantially similar to Statiflex (without VBS style bayonets) without restriction.

d.  This Agreement embodies the entire agreement and understanding between TPI and VBS and supersedes all prior agreements and understanding relating to the subject matter of this Agreement.

e.    The terms and provisions of this Agreement may not be modified or amended except in a writing signed by TPI and VBS.

IN WITNESS WHEREOF, the Parties have caused this Exclusive Manufacturing and Distributor Agreement to be executed by their respective officers thereunto duly authorized as of the date below noted.

VBS INDUSTRIES INCORPORATED

By: _____
    Gary L. Sandercock
    Its:_____ President

Date: _____


TECHNIFAB PRODUCTS, INC.

By: _____
    Steve Short
    Its: President

Date: _____ 11/15/01

7

**SCHEDULE 1-A**

DYNAFLEX in its current form

POLYFLEX in its current form

PHASE SEPARATORS in its current form

LCI's in its current form

STATIFLEX in its current form

**SCHEDULE 1-B**

STANDARD TRANSFER HOSES in its current form

SCHEDULE 10

LIMITED WARRANTY
Warranted by
**Technifab Products, Inc.**
For
**VBS Industries, Inc.**

## Limited Warranty

All products are warranted against defects in workmanship or materials under normal use for one year after purchase form Technifab Products, Inc. (TPI). Any part, which is determined by TPI to be defective in material or workmanship and returned, as TPI designates, will be, as the exclusive remedy, repaired or replaced, at TPI's option.

TPI warrants against defects, all materials and workmanship, provided by TPI, for the repair or modification of customer supplied equipment, under normal use, for one year after repairs or modification by TPI.

*Note: Statiflex is warranted as stated herein but for a period of two years instead on one.

*Note: Dynaflex is warranted as stated herein but for a period of two years instead on one.

## Warranty Disclaimer

TPI disclaims any liability for product defect claims that are due to product misuse. TPI disclaims any liability for any pre-existing workmanship or material for products TPI repairs or modifies. TPI warrants vacuum retention only if vacuum loss is attributed to material or workmanship provided by TPI.

## Limits Of Liability

In no event shall TPI's liability exceed the purchase price paid or payable by buyer.

## Freight

There are two distinct types of warranty situations:

1.      Product was simply made wrong by TPI and discovered upon arrival at customer site.

For equipment within the continental U.S. TPI will pay shipping both ways. Shipment will be via UPS Groundtrack. If the shipment is too large to ship via UPS it may be shipped via Motor Freight with the carrier to be chosen by TPI.

For equipment outside of the continental U.S. TPI will decide whether it is necessary to return the entire product for rework or simply to build a new replacement product. If the product must be returned TPI will select the method of shipment and will pay the freight. If it is not necessary to return the entire product the customer will cut off the end bayonet with the undisturbed serial number tag / engraving and send that back in lieu of the entire pipeline. TPI will select the method of shipment and will pay the freight.

2.      Product is at customer site for 30 days or more and fails for some reason while still under warranty.

The customer is responsible for the freight to return the goods to TPI. TPI will evaluate the goods. If repairs are required and those repairs are covered by warranty TPI will pay shipping costs to return the goods via UPS Groundtrack to any point in the continental U.S. designated by VBS. If the shipment is too large to ship via UPS it may be shipped via Motor Freight with the carrier to be chosen by TPI.

## Replacement Products

When one portion of a larger system fails it is sometimes impractical to return the product for evaluation due to the potential cost of shutting down the entire system. In those cases VBS may request a "Warranty Replacement" be supplied prior to return of the faulty part.

If TPI agrees to provide a warranty replacement prior to return of the failed part the payment of freight will be determined per the situation (see #1 or 2 above).

If TPI agrees to provide a warranty replacement prior to return of the failed part it will be treated as a consignment. The failed part must be returned within thirty days of shipment of the replacement. If the failed part is not returned within that period the replacement part will be invoiced in full.

## Returned Goods Authorization

Prior to return of any goods VBS must notify TPI of the intent to return them. VBS must provide the description and S/N of each item to be returned. At this time any unusual or unclear circumstances should be discussed and all decisions about the payment of freight should be made.

TPI will then assign a Returned goods Authorization Number (RGA#). This RGA# must be referenced on the return shipment and all associated paperwork.

TPI will not pay freight nor accept collect shipments for any items without an RGA#.

JS 44 (Rev. 12/07)(cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

CRYOTECH INTERNATIONAL, INC., a Delaware corporation, fka VBS Industries Incorporated

## DEFENDANTS

TECHNIFAB PRODUCTS, INC., an Indiana corporation; and DOES 1-50, inclusive

**(b)** County of Residence of First Listed Plaintiff   Santa Clara, California
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Clay, Indiana
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Johanson Berenson LLP
1792 Second Street
Napa, CA 94559
(707)226-8997

Attorneys (If Known)

C08  02921 HRL

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                            and One Box for Defendant)

|                                      | PTF | DEF |                                                      | PTF | DEF |
|--------------------------------------|-----|-----|------------------------------------------------------|-----|-----|
| Citizen of This State                | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State             | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation                                    | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|----------|-------|-|--------------------|------------|----------------|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | | ☐ 892 Economic Stabilization Act |
| | | | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | Security Act | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | | ☐ 871 IRS—Third Party | Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus – | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332.

Brief description of cause:
Diversity

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
- DEMAND $ more than $75,000.00
- CHECK YES only if demanded in complaint:
- JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

- ☐ SAN FRANCISCO/OAKLAND
- ☒ SAN JOSE

DATE   6/12/08

SIGNATURE OF ATTORNEY OF RECORD